## HEIM v. UNIVERSAL PICTURES CO., Inc., et al.

### No. 178.

Circuit Court of Appeals, Second Circuit.

Feb. 16, 1946.

---

Plaintiff further testified as follows: In the writing of his song he did not base any part of it upon any prior musical work; he definitely was not influenced at all by any prior works; and that every part of his musical composition was original with him. In Berlin, in 1930, for the first time he met Joe Pasternak, the producer of the film "Nice Girl" for the Universal Pictures Co., Inc., in which the defendants' song "Perhaps" was sung by the actress Deanna Durbin; from 1933 through 1937 he saw Joe Pasternak very often in Europe, but mostly in Budapest and in Vienna; Pasternak lived in a studio in Budapest, and the plaintiff also lived in the studio; that Pasternak, who represented the defendant Universal Pictures Co., Inc., in Europe at that time, had an office in the same studio where the Hun-

garian picture "Budai Cukraszda" was produced.

Plaintiff said that he came to the United States on March 8, 1939. By letter, he subsequently "contacted" Pasternak, who was then in California, through his agent, about his song "Ma Este Meg Boldog Vagyok," because when Pasternak was in Hungary "he liked it very much." Plaintiff said that he does not claim that the lyrics of the defendants' song infringed upon his composition; but that only the verse of defendants' composition infringed upon the chorus of his composition, as the verse of the defendants' song is the same as the chorus of his song; and that "where little changes are made they are unmusical." He said that no part of the chorus of his song was taken from Dvorak's "Humoresque"; that no part of the chorus of his song was taken from any music in the public domain; and that his song is a wholly original composition; that the Hungarian picture "Budai Cukraszda" played in the State of California; but that he has never met Aldo Franchetti, the writer of defendants' song, "Perhaps," or Andres De Segurola, the writer of the lyrics of defendants' song.

Without contradiction, the evidence shows the following: Plaintiff's agent, Foreign & Domestic Music Corp., wrote to Pasternak, as follows:

"November 4th, 1940
"Mr. J. Pasternak
"Universal Pictures Company, Inc.
"Universal City, California.

"Dear Mr. Pasternak:

"We are pleased to announce that (Emery H. Heim) Hadju Imbre of Budapest who you know very well is under contract with our company. We are sending you under separate cover some of his outstanding compositions published in Hungary and here. Included in this lot are:

"Dumaparti Randevu
"Budai Cukraszda
"Red Bizom Afelesegem
"Tokai Rapszodia

If interested in using any of the songs please be good enough to communicate with this office.

"Very truly yours,
"Foreign & Domestic Music Corp.
"Samuel Cummins"

On November 19, 1940, Pasternak, on the stationery of the Universal Pictures Company, Inc., replied from California, as follows:

"November 19, 1940
"Mr. Samuel Cummins,
"Foreign & Domestic Music Corp.
"230 E. 41st Street,
"New York, N. Y.

"Dear Mr. Cummins:

"I have your letter of the 14th and the music which I have noted.

"I am sorry to tell you that at the present time I would not be interested because I have most of the music set for my three forthcoming productions. Perhaps at some time in the future I can use some of your material. Many thanks for sending in your suggestions to me."

Celia B. Cohen, the secretary and treasurer of the Foreign & Domestic Music Corporation, testified that she mailed to Joe Pasternak the letter of November 4, 1940, and also the musical compositions mentioned in said letter, one of which was Budai Cukraszda. She further testified that when the letter of Joe Pasternak dated November 19, 1940, was received by the Foreign & Domestic Music Corporation, the music was not enclosed and was never returned thereafter. She also testified on cross examination that the corporation was owned and controlled by plaintiff and two others, and that plaintiff was the "most active member of the corporation" but did not alone determine its policies.

Plaintiff's attorney served a notice upon the attorney for the defendants to produce upon the trial of this action the contract between Pasternak and the Universal Pictures Co., Inc., but the same was not produced; but instead the attorney for defendant stipulated that Pasternak was the the producer of the film "Nice Girl," in which the defendants' song "Perhaps" was sung by the star Deanna Durbin, and that Pasternak had charge of the production of the film; that as such producer Pasternak had the power to determine the use or exclusion of the use of the song if he so desired; that all songs controlled by Universal Pictures Company and used in their pictures are published by Robbins Music Corp. and that the song "Perhaps" was such a song; and that the Universal Music Corporation is a subsidiary of Universal Pictures Co., Inc., and that the copyright to the song "Perhaps" was held in its name.

Plaintiff called as a witness one Adler who, in open court at the trial, testified as an expert on music that there is a substantial similarity between the "verse" of the defendants' song and the "chorus" of plain-

tiff's song,[1] and that in his opinion there was a substantial taking of that "chorus" in defendants' "verse."

After cross examination, he testified on redirect that, as a musician, if he heard the chorus of the plaintiff's song and the verse of the defendants' song, he would not say that they would bring to his mind any similarity with "Humoresque."

Samuel Cummins, as witness for plaintiff, testified on examination before trial that plaintiff transferred the song to Foreign and Domestic Music Corporation, of which he, Cummins, was general manager, under a written agreement which had been destroyed in a fire; the corporation had never published the song or done anything with it; no musical arrangement had been made of the song for commercial performance, it had never been submitted to anyone for performance, and had never been submitted to any recording company.

Franchetti did not appear at the trial. Defendants put in evidence his deposition taken in California on December 5, 1942, at the instance of defendants. It consisted of written, direct interrogatories and cross interrogatories. In that deposition he said that he is a prominent musical composer and conductor, having received a diploma of professor of music from the Royal Conservatory of Milan in 1907; for many years had played practically every musical instrument and had conducted orchestras all over the world; composed about two thousand songs and about one hundred and fifty major works, such as symphonies, orchestra poems and operas, having received the David Bispham gold medal for his opera "Namiko-San" which was performed all over the United States; and since 1937 had been in the regular employ of Warner Bros., motion picture studio in California. He further testified that he wrote his song for himself about December, 1939, with no intention to sell it; that the words were originally written by a Mrs. Cuttle who came to him with four or five lyrics to which she asked him to write music; that he selected one and composed his song "in front of Mrs. Cuttle" in "about fifteen or twenty minutes"; that he then played it for Mr. Segurola; and that Segurola liked the music, but not the words, and bought the music from him; that at the time he composed the music of the verse of "Perhaps," he was thinking of the "Humoresque," because it was to be a happy song in the "Humoresque' style;" that "the first bar, about eight notes, was a sort of take-off of Dvorak's 'Humoresque,'" and was "just fashioned after that type of work"; that he never met the plaintiff; that prior to the commencement of this action he never heard the plaintiff's song, and that he never had access thereto; that he did not take, copy or adopt said musical composition entitled "Perhaps" from plaintiff's song; that he never saw, heard or had access to or had any knowledge of any motion picture entitled "Budai Cukraszda."

On cross, Franchetti stated in his deposition that he composed the music of the song "Perhaps," which was used in the Universal Picture "Nice Girl," about December, 1939; that he was not instructed by Pasternak to compose the song; that Pasternak did not have any conference with him as to the type of song desired prior to the composition of "Perhaps"; that Pasternak never told him that he was familiar with plaintiff's song; that Pasternak never showed him the music of that song; that he dealt with Segurola only; that he never had anything to do with Universal, and was never employed by them; that he was not employed to write music for the picture "Nice Girl," produced by Joe Pasternak for Universal Pictures Co., Inc., before he composed the song "Perhaps."

Franchetti was asked on cross-interrogation the following question: "Please state your position with the defendant Univer-

---

[1] His testimony on that point is as follows: "Q. Will you compare and analyze the songs, showing us what similarity, if any, you found, and the significance of the similarities? A. On the introduction of the defendants' song, it is based or built on the first measures of the plaintiff's song. The first two measures of the plaintiff's chorus are similar or identical in melody, harmony and rhythm to the defendants' chorus. I have made a few notes which I will refer to now. The first five notes in the third measure are the same, that is, the same in the defendants' verse as the plaintiff's chorus. The fourth measure is alike except for a slight change in harmonic progression. In the third part of the measure you have 5, 6, 7 and 8, which have the same harmonic frame, rhythm and melody, and the 9th and 10th exactly alike in bar; the 13th measure, the first two notes are alike, and the musical result is the same in the entire measure. Then, in my opinion, the 14th and 15th are not alike."

sal Pictures Co., Inc., and the Universal Music Corporation at the time you composed the song 'Perhaps.'" To this cross-interrogatory he gave no answer.

The defendants offered in evidence the agreements under which they acquired the right and title to their song, as follows: (a) An agreement between Franchetti, as composer, and Andres de Segurola, as purchaser, made on April 29, 1940, at Los Angeles, California, whereby the composer sold his rights to the song "Dancing Doll" (the name originally given to "Perhaps"). In paragraph "6" of this agreement the "Composer further warrants that such work is original with the Composer in all respects and that no part thereof was taken from, or based upon any other musical work * * * that such work is not in the public domain"; and that the consideration for the song is $100. (b) An assignment of the rights to the song "Dancing Doll," also known as "Perhaps," from Segurola to Universal Pictures Company, dated November 28, 1940; it warrants "that said music is not, nor is any part thereof, in the public domain but is validly copyrightable throughout the world as original work." (c) An assignment from Segurola to Universal Pictures Co., Inc., of the rights to the lyrics written by Segurola for the defendants' song "Perhaps," dated November 28, 1940. (d) A letter from Universal Pictures Co., Inc., upon the stationery of the Universal Pictures Company, dated and addressed as follows:

"Universal City, California.
"November 28, 1940
"Mr. Andres de Segurola,
"% Universal Pictures Company, Inc.
"Universal City, California.
"Dear Mr. de Segurola:"

In this letter, Universal Pictures Co., Inc., stated that, "As consideration in full for your execution and delivery of said assignments to us and for all of your agreements, representations, warranties and assignments made therein, we have paid you the sum of Seven Hundred and Fifty Dollars ($750.00), receipt of which you hereby acknowledge"; and in addition thereto the letter provides that 66⅔% of all royalties from the publication of the song and 33⅓% of all royalties from the mechanical rights of said music shall be paid to Segurola. (e) An assignment from Franchetti to Universal Pictures Company, for the consideration of $1.00, of the song "Perhaps," also known as "Dancing Doll," dated November

28, 1940, and written upon the stationery of the Universal Pictures, and contains the warranty "that said work is not, nor is any part thereof, in the public domain," and "represents and warrants that said work is original with the undersigned in all respects; that the same is not, nor is any part threof, taken from or based upon any other musical, dramatic or other work."

Kenneth S. Clark, defendants' expert on music, on direct examination in open court, testified that the chorus of the plaintiff's song and the verse of defendants' song are identical with the prominent strain in the "Humoresque". The defendants then offered in evidence nine popular songs, which were copyrighted prior to plaintiff's song; Clark testified that all of these nine songs are patterned after "Humoresque." Clark further testified that a verse is added to a popular song to make it longer "so when the public buys a copy they think they get their money's worth"; the theme is always in the chorus and never in the verse; the title, one of the most material parts, is always in the chorus, and never in the verse; a singer or an orchestra almost never renders the verse; the orchestra usually plays the chorus, the singer sings it, and then the orchestra repeats the chorus in another key for variety; the public only hums, whistles and sings the chorus and never the verse; and many of the popular songs do not even have a verse.

On cross-examination, Clark testified that to the average ear there is a similarity between the chorus of plaintiff's song and the verse of defendants' song and that both are from "Humoresque"; that the chorus of plaintiff's song and the verse of defendants' song are very familiar because they are exactly the same as the phrase from "Humoresque," which is a very common theme to everybody; and that the nine popular songs offered in evidence by defendants are all substantially similar to the song of plaintiff and the song of defendants to a greater or less degree, some more and some less; that some listeners hearing these nine popular songs would immediately detect a substantial similarity between any one of those songs and the plaintiff's chorus and the defendants' verse; and that some listeners might be subaverage and would not detect, and that in his opinion, if a person could not detect, such similarity, he would be below the average listener.

Adler, plaintiff's expert, in rebuttal, testified that in his opinion, after examining

all of the nine songs offered by defendants, he could see no substantial similarity between any of these nine songs and the plaintiff's song or defendants' song; that there is a similarity between the popular songs themselves, but that there is no similarity between these popular songs and the plaintiff's.

The trial judge held that plaintiff's copyright was invalid, that plaintiff was not the real party in interest, and that none of the defendants had infringed. He entered judgment dismissing the complaint on the merits. In his opinion he said:

"The court finds there is substantial identity of the indicated phrases of the musical compositions of plaintiff and that produced by Universal Pictures. This is not seriously controverted. In answer to this proof, defendants showed by the depositions of Aldo Franchetti that he was the writer of the music of 'Perhaps', and that he had taken the suggestion of the accused bars from a certain phrase in the 'Humoreske' of Dvorak, a work long within the public domain. It is true that when played, even in the same key, the phrases of 'Humoreske' appear but slightly reminiscent of either of the two songs in dispute. But this constitutes no refutation of the testimony when it is considered that the sixteen-note phrase of the 'Humoreske' is identical in progression with defendants', except that the latter omits the 14th and 15th notes. The bars in each are identical, but as noted above, the harmonies are different, as is the accent. Franchetti is a composer of some two thousand songs and over one hundred major compositions, including the opera 'Namiko-San', for the production of which he was awarded the David Bispham Medal.

"There is no lack of ingenuity here, apparently, and this adds credence to be given to his testimony. Reinforcement is obtained from the fact that the note and bar sequence of plaintiff's own phrases are identical with 'Humoreske', although the harmony and melody are divergent. The casual occurrence of this phrase in either plaintiff's or defendants' composition is indicated by the fact that it occurs in modified forms in other popular music. But although this reasoning is convincing, the plaintiff in any event must fail, owing to the entire absence of proof of access. Plaintiff's case upon this point is almost negligible. It is contradictory and untrustworthy. On the other hand, it is positively shown that plaintiff has never met nor had any contact with Franchetti, that plaintiff had never been in California, and it was further shown that he had no proof that the piece had ever been performed in California. The work of plaintiff had a very narrow field in the United States. Upon the point of access, plaintiff did not sustain the burden of proof."

Among the judge's findings of fact are the following:

8. That no printed copies of plaintiff's said musical composition were ever distributed, offered for sale, sold or disposed of in the United States and no phonograph recordings of plaintiff's said musical composition were ever made, distributed, offered for sale, sold or disposed of in the United States.

9. That said musical composition was never performed in the United States outside of New York City and such performances of said musical composition, if any, were negligible and of no moment.

11. That defendant Aldo Franchetti, received a diploma as a Professor of Music from the Royal Conservatory of Milano, Italy in 1907, plays practically every musical instrument, has conducted orchestras all over the world, has composed about two thousand songs, and about one hundred fifty major works such as symphonies, operas and orchestra poems, having received the David Bispham gold medal for his opera "Namiko-San" which was performed all over the United States and has been regularly employed at the motion picture studio of Warner Bros. in California since 1937.

14. That defendants' said musical composition was copyrighted by publication in the United States in 1941.

15. That the alleged similarity in the two compositions is that of a fourteen note phrase in the verse of defendants' said musical composition to a sixteen note phrase in the chorus of plaintiff's said musical composition.

16. That in the writing of the said phrase of the verse of defendants' said musical composition, defendant Aldo Franchetti was influenced by and took the suggestion of the music thereof from the music of the well known musical composition entitled "Humoreske" by Anton Dvorak, which he had frequently played on the violin.

17. That the note and bar sequence of said phrase in the verse of defendants' said

musical composition is identical with phrases in said musical composition entitled "Humoreske," except that two notes in said phrase of the latter composition do not appear in said phrases of the former composition.

18. That the note and bar sequence of said sixteen note phrase in the chorus of plaintiff's said musical composition is identical with phrases of said musical composition entitled "Humoreske."

19. That the said phrase in the chorus of plaintiff's said musical composition was not original with plaintiff.

22. That prior to defendant Aldo Franchetti writing the music of defendants' said musical composition, he never heard, had knowledge of, or access to plaintiff's said musical composition, or any copy, notation or form thereof.

23. That no part of the music of defendants' said musical composition was based upon, or taken, copied or adapted from, the music of plaintiff's said musical composition or any part thereof.

24. That prior to the institution of this action plaintiff disposed of his rights in plaintiff's said musical composition to Foreign and Domestic Music Corp. and notice of the alleged infringement was served at plaintiff's insistence on defendants Universal Pictures Company, Inc., and Robbins Music Corporation, by said Foreign and Domestic Music Corp. as exclusive owner of said musical composition.

Henry Pearlman, of New York City, for appellant.

Julian T. Abeles, of New York City, for appellees.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. The Hungarian publisher, the proprietor at the time of the copyright registration on September 14, 1936, was a citizen of a foreign country with which the United States has a treaty extending copyright protection to Hungarian citizens in accord with § 8(b).[1] As publication in Hungary occurred on November 11, 1935, the registration followed publication, and therefore § 9, not § 11, applied. As on the date of publication the author was a citizen of Hungary, and the song had then been published solely in a foreign state, there was compliance with § 12, as amended in 1914, by the deposit of one complete copy.[2] The trial judge correctly found that "no printed copies * * * were ever distributed, offered for sale, sold or disposed of in the United States." The letter of November 4, 1940, from Cummins to Pasternak, enclosing a copy of the song, was not a publication or offering for sale in the United States.[3] Nor were the playings of the song here,[4] nor was the filing of the copy in the copyright office.[5] The sales of imported copies in this country were not shown to have been authorized by the then proprietor. It follows that the mistake of date in the notice of copyright was not, on any theory, a violation of §§ 9 and 18; for § 9 merely requires that the notice be affixed to each copy "published or offered for sale in the United States by authority of the copyright proprietor." We construe the statute, as to a publication in a foreign country by a foreign author (i.e., as to a publication described in the 1914 amendment), not to require, as a condition of obtaining or maintaining a valid American copyright, that any notice be affixed to any copies whatever published in such foreign country, regardless of whether publication first occurred in that country or here, or whether it occurred before or after registration here.[6]

■ It seems to be suggested by some

---

[1] See 17·U.S.C.A. § 8(b) and note, 37 Stat., pt. 2, 1631.

[2] The 1914 amendment inserted the words "or if the work is by an author who is a citizen or subject of a foreign State or nation and·has been published in a foreign country, one complete copy of the best edition then published in such foreign country."

[3] Allen v. Walt Disney Productions, Ltd., D.C., 41 F.Supp. 134, 136; cf. Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159, 162, 163; Falk v. Gast Lithograph & Engraving Co., 2 Cir.,

54 F. 890; cf. Patterson v. Century Productions, 2 Cir., 93 F.2d 489, 492.

[4] See McCarthy & Fischer, Inc. v. White, D.C., 259 F. 364; Shafter, Musical Copyright (2d ed. 1939), 130–131.

[5] Cf. Osgood v. A. S. Aloe Co., C.C., 69 F. 291, 294; Patterson v. Century Productions, supra, 93 F.2d at page 493.

[6] In United Dictionary Co. v. G. & C. Merriam Co., 1908, 208 U.S. 260, 28 S. Ct. 290, 52 L.Ed. 478, it was held that if a work were copyrighted here, the omission of notice of the American copyright from an edition subsequently pub-

text-writers[6a] that, under the 1914 amendment, where publication abroad precedes publication here, the first copy published abroad must have affixed to it the notice described in § 18. Such a requirement would achieve no practical purpose, for a notice given by a single copy would obviously give notice to virtually no one. There is no doubt textual difficulty in reconciling all the sections, as has been often observed; the most practicable and, as we think, the correct interpretation, is that publication abroad will be in all cases enough, provided that, under the laws of the country where it takes place, it does not result in putting the work into the public domain. Assuming, arguendo, that plaintiff's publication in Hungary did not do so, it could not affect the American copyright that copies of his song were at any time sold there without any notice of the kind required by our statute, and it would therefore be of no significance, in its effect on the American copyright, if copies sold in Hungary bore a notice containing the wrong publication date. On that assumption, there would be no need to consider whether, had the notice with the mistaken date been affixed to copies published or offered for sale in the United States by authority of the proprietor, that mistake would have invalidated the copyright,[7] especially in the light of § 20. We

do not know whether the publication in Hungary was such as to amount to dedication in that country, but, as we are affirming the dismissal of the complaint for other reasons, it is not necessary to decide that question.

2. In a suit like this, plaintiff, to make out his case, must establish two separate facts: (a) that the alleged infringer copied from plaintiff's work, and (b) that, if copying is proved, it was so "material" or "substantial" as to constitute unlawful appropriation.[8] Plaintiff here must lose for failure to establish the first of these facts.

The evidence by no means compels the conclusion that there was access; on the other hand, it does not compel the conclusion that there was not. Consequently, copying might still be proved by showing striking similarity. Here similarity exists; indeed, a passage in Franchetti's "verse" is identical with one in plaintiff's "chorus." Mere similarity is not enough; but here one finds more; both to the eye and ear, the identity is unmistakable, as defendants virtually concede. But defendants explain this fact by saying that, quite independently, both composers utilized a common source—either Dvorak's composition or the older commonplace theme which Dvorak had adopted and adapted.

---

lished in England did not invalidate the copyright.

We do not read the 1914 Amendment as a mere codification of the ruling in that case, i. e., as limited to cases where the foreign publication occurs after an American copyright has been obtained or after publication in this country.

Universal Film Mfg. Co. v. Copperman, D.C., 212 F. 301, 303, 304, related to a copyright which ante-dated the 1914 amendment to § 12. Basevi v. Edward O'Toole Co., D.C., 26 F.Supp. 41, 46, we think was wrongly decided on this point.

6a. Ladas, The International Protection of Literary and Artistic Property (1938) 698, says, in speaking of the 1914 amendment to § 12: "It would seem difficult to give a safe interpretation of the Act in this respect. However, if the rule established in the first part of § 9 is to be given effect to, i. e., the rule that a person 'may secure copyright for his work by publication thereof with the notice of copyright required by the Act;' it would seem that no person is entitled to claim statutory copyright under the Act, unless, when first publishing the work

abroad or in the United States, he has affixed the statutory notice. Thereafter, the notice need not appear on each copy of the work published outside the United States, since the second part of § 9 requires this only of 'each copy thereof published or offered for sale in the United States.'" See also 13 C.J. 1063, note 33.

7 Were that question here, we should have to consider whether the statement in Baker v. Taylor, Fed.Cas.No.782, and subsequent cases which cite it apply under the present liberalized Copyright Act; see Washingtonian Publishing Co. v. Pearson, 306 U.S. 30, 59 S.Ct. 397, 83 L.Ed. 470; United States v. Backer, 2 Cir., 134 F.2d 533; Shafter, loc. cit., 98.

8 See Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464.

Thus, e. g., the alleged plagiarist might openly admit that he copied, but he could defend by showing that his copying was too insubstantial to be wrongful.

There may be wrongful copying, though small quantitatively; so if someone were to copy the words, "Euclid alone has looked on Beauty bare," or "Twas brillig and the slithy toves."

488

■ As, however, both optically[9] and aurally, plaintiff's treatment is distinguishable from Dvorak's and also from the older commonplace theme, that explanation would not wash, were plaintiff's contribution highly original.[10] In an appropriate case, copying might be demonstrated, with no proof or weak proof of access, by showing that a single brief phrase, contained in both pieces, was so idiosyncratic in its treatment as to preclude coincidence. In such circumstances, stimulation by the same stimulus would not serve as a defense: Buchanan tells us that Kekulé's "idea of the carbon-ring came out of the lurid imagery of a morning after a party";[11] many a chemist had had a like experience without such a fruitful result. Hamilton reported of his great mathematical discovery that "the Quaternions started into life, or light, full grown, on the 16th day of October, as I was walking with Lady Hamilton to Dublin, and came up to Brougham Bridge"; no other mathematician who had observed a bridge when strolling with his wife in mid-October had made the same discovery.[12] Nor would it be alone enough that the passage in question is brief[13] or that the identical matter in plaintiff's song is found in the "chorus," and, in Franchetti's, in the "verse." Nor would Fran-

chetti's musical reputation and achievements answer,[14] for Handel ruthlessly plagiarized;[15] we do not accept the aphorism, "When a great composer steals, he is 'influenced'; when an unknown steals, he is 'infringing.'"[16]

■ On the issue of copying, it was proper for the trial judge to avail himself of (although not to be bound by) expert testimony. He heard the experts of both sides. In effect, he found that plaintiff's method of dealing with the common trite note sequence did not possess enough originality, raising it above the level of the banal,[17] to preclude coincidence as an adequate explanation of the identity. We cannot say that the judge erred.[18] Whether, had he reached a contrary conclusion, we would have affirmed, we do not consider.

Affirmed.

CLARK, Circuit Judge (concurring in the result).

1. The opinion holds that American copyright is secured by publication abroad without the notice of copyright admittedly required for publication here. This novel conclusion, here suggested for the first time, seems to me impossible in the face of the statutory language that the person

---

[9] On the issue of copying—as distinguished from the issue of illicit copying—"dissection" and optical analysis are proper aids to the trier of the facts. See Arnstein v. Porter, supra.

[10] "Beethoven's Fifth Symphony is a marvellous structure on a commonplace theme;" Shafter, loc. cit., 197.

As to the way in which Coleridge creatively employed phrases he found in tales of sea voyages, see Lowes, The Road to Xanadu, 2d Ed., 1930, 59, 434, quoted in Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 638 note 1.

[11] Buchanan, Possibility (1927) 189.

[12] Graves, Life of Sir William Rowan Hamilton (1882) II, 434–436, quoted in Porterfield, Creative Factors in Scientific Research (1941) 97.

Helmholz said that "his most important thoughts" came to him "during the slow ascent of hills on a sunny day"; see Graham Wallas, The Art of Thought (1926) 80; no other hill-climbing physicist anticipated Helmholz's works.

[13] See Boosey v. Empire Music Co., D. C., 224 F. 646; Farmer v. Elstner, C. C., 33 F. 494, 496. Quantity, in some cases, where copying and misappropriation have been proved, may affect the measure of damages. Witmark & Sons v. Pastime Amusement Co., D.C., 298

F. 470, 477, affirmed 2 Cir., 2 F.2d 1020.

[14] Cf. Macaulay's Essay on Robert Montgomery.

[15] For a defense of Handel, by way of confession and avoidance, see Tovey's article on Handel in 12 Encyc. Britannica, 910, 914, 915. Handel's ruthlessness in general is illustrated in the story of "his holding the great prima donna Cuzzoni at arms-length out of a window and threatening to drop her unless she consented to sing a song which she had declared unsuitable to her style"; see Tovey, loc. cit., 911.

[16] Shafter, loc. cit., 189.

[17] We do not mean that such originality is essential to the validity of a copyright. See Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 250, 23 S.Ct. 298, 47 L.Ed. 460; Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 53, 54; Fred Fisher, Inc. v. Dillingham, D. C., 298 F. 145, 149; cf. Hein v. Harris, C.C., 175 F. 875.

As to the needed quantum of originality, see Chamberlin v. Uris Sales Corp., 2 Cir., 150 F.2d 512, 513; Shafter, loc. cit., 223, 224.

[18] Accordingly, we never reach the question whether, assuming that Franchetti copied, his copying went beyond permissible bounds.

thereto entitled "may secure copyright for his work by publication thereof with the notice of copyright required by this title," § 9 of the Copyright Act, 17 U.S.C.A. § 9, and § 18, defining the "notice of copyright required by section 9 of this title," with the provision that as to a work of the character here involved "the notice shall include also the year in which the copyright was secured by publication." It is against the view of such expert copyright judges as Hough, J., in Italian Book Co. v. Cardilli, D.C.S.D.N.Y., 273 F. 619, and Universal Film Mfg. Co. v. Copperman, D.C.S.D.N.Y., 212 F. 301, affirmed 2 Cir., 218 F. 577, certiorari denied 235 U. S. 704, 35 S.Ct. 209, 59 L.Ed. 433, and Woolsey, J., in Basevi v. Edward O'Toole Co., D.C.S.D.N.Y., 26 F.Supp. 41,[1] and apparently the universal assumption of text writers. See Howell, The Copyright Law, 1942, 73; Ladas, The International Protection of Literary and Artistic Property, 1938, 698; Ball, The Law of Copyright and Literary Property, 1944, 217; Copyright Protection in the Americas (Law & Treaty Series No. 16) 66; 18 C.J.S. Copyright and Literary Property, § 66, p. 190.

While the ground of the decision is not made clear, apparently it is based upon the second part of § 9, reading as follows: "and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 21 of this title." But this deals with the preserving of the copyright after the original publication has secured it, Sieff v. Continental Auto Supply, Inc., D. C. Minn., 39 F.Supp. 683; Fleischer Studios v. Ralph A. Freundlich, Inc., 2 Cir., 73 F.2d 276, certiorari denied Ralph A. Freundlich, Inc. v. Fleischer Studios, 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250; Basevi v. Edward O'Toole Co., supra; Record & Guide Co. v. Bromley, C.C.E.D.Pa., 175 F. 156;

18 C.J.S., Copyright and Literary Property, § 71, p. 193, and is indeed the only direct requirement for notice of the already acquired copyright. Other sections rest upon such a requirement, e.g., § 18 as to the form of notice, § 19 as to its location on the publication, and § 20 dealing with the effect of accidental omission of notice from a copy or copies. The second part of § 9, therefore, does not destroy the effect of what is said in the first part of the same section.

There is nothing in § 12 to support the stated thesis. That section requires deposit of copies before an action of infringement is brought, but explicitly applies only "after copyright has been secured by publication of the work with the notice of copyright as provided in section 9 of this title." Hence its amendment in 1914, to require only one copy (instead of two) of a work by a citizen of a foreign state published abroad, while perhaps affording some additional evidence that § 9 was intended to include publication abroad, 18 C.J.S., Copyright and Literary Property, § 66, p. 191, contains nothing to suggest the exception here read into § 9.[2] Moreover, the reference in § 9 to books seeking ad interim protection under § 21 is significant; the latter section affords protection to a limited class of publications—books first published abroad in the English language—under a special procedure; all others must follow the general procedure and preserve their copyright in America by affixing the required notice to copies published or offered for sale. The provision does include, at least by implication, the rule settled by United Dictionary Co. v. G. & C. Merriam Co., 208 U.S. 260, 28 S.Ct. 290, 52 L.Ed. 478, that notice of copyright must be carried only on copies published or offered for sale here; but it does not suggest an exception, operating against American authors, in the process of originally securing the copyright by publication.[3]

---

[1] Moreover, no such exception is hinted at in general discussions of the subject in cases such as Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 59 S.Ct. 397, 83 L.Ed. 470, United States v. Backer, 2 Cir., 134 F.2d 533, Advertisers Exchange v. Anderson, 8 Cir., 144 F.2d 907, and other cases cited below.

[2] Therefore the suggested distinction of Judge Hough's decision in Universal Film Mfg. Co. v. Copperman, supra, as applying to a copyright secured before 1914, is inadequate.

[3] This view is also supported by the legislative history of § 9, showing that the words "in the United States" originally appeared in the first, or crucial, part of the statute. Howell, loc. cit. supra. In that earlier form, restricting the securing of copyright to publication in the United States, the requirement of publication with notice was unambiguous. But the broadening of the provision as to place of publication was not accompanied by any change at all as to the requirement of notice. Of course there

The opinion seeks further support because the requirement would achieve "no practical purpose." There perhaps may be some doubt as to the utility of any notice; it is said not to be required in "most foreign countries." Howell, 73. But if Congress thought it a necessary requirement for the literary monopoly it granted, common fairness would seem to suggest that it apply also to publication abroad, or at least that foreign publication be not made notoriously easier and more profitable than domestic publication. And the required notice does furnish a certain amount of information and warning to competitors and possible infringers, perhaps enough to warn them away from infringement in many an obvious case. That more drastic requirements might have accomplished more does not justify elimination of those which were specifically retained.

Since, therefore, the record shows incorrect dating of the Hungarian publication, we must face the decision in Baker v. Taylor, C.C.S.D.N.Y., Fed.Cas.No. 782, that statement of a later than the actual date invalidates a copyright, and the general view that it still represents the law. See, e.g., American Code Co. v. Bensinger, 2 Cir., 282 F. 829, 836; Howell, 66; Ladas, 746; Shafter, 98. True, in Baker v. Taylor, supra, there was more than a mistake, for the error was persisted in after it was discovered. But it is difficult to get away from the rationale suggested in the cases that stating a later date is a more serious mistake than stating an earlier date, for the former may be a wrong to the public as extending the term, while the latter at most only penalizes the copyright owner. Callaghan v. Myers, 128 U.S. 617, 654, 657, 9 S.Ct. 177, 32 L.Ed. 547. Sec. 20 of the Act does not help, for this is not the case of omission of the notice by accident or mistake "from a particular copy or copies," but a mistake in the publication by which the original copyright was secured. The liberalizing trend shown by the Act of 1909 does not appear to have extended to this requirement, and I fear that on the authorities we must hold the copyright invalid. On that ground alone, and with some hesitation, I would support the judgment below.

2. Except for the question as to the copyright I would think the plaintiff quite entitled to judgment, since, notwithstanding the apparently trifling value of the verse, as distinguished from the refrain, of popular music, the evidence is strong as to copying and access and defendants' answering evidence is significantly weak. Franchetti's verse was a "Chinese copy" of plaintiff's song in its significant parts, and so similar in the others that, as the trial judge said, substantial identity does not appear to be seriously controverted. As to the reference to Dvorak's "Humoreske," since plaintiff's song is quite different in rhythmic values, setting, and arrangement from the latter, the similar musical progression found in the midst of certain measures of the latter (in itself simple enough before touched by Dvorak's genius) does not prevent copyright by plaintiff; and the only use of the material is in the attempt—clearly unsuccessful—to make Franchetti's disclaimer of infringement seem "plausible." Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 54, certiorari denied Metro-Goldwyn Pictures Corp. v. Sheldon, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392; Fred Fisher, Inc. v. Dillingham, D.C.S.D.N.Y., 298 F. 145.

Proof of access on the part of Pasternak was direct and immediate while both were in Hungary; and again there was direct evidence of submission of the song to him at the very time use of Franchetti's song was becoming important in November, 1940. True, Franchetti claims a somewhat indefinite date of composition which would be earlier, and shows a transfer of "Dancing Doll" to his lyricist in April, 1940. But defendants' testimony is convincing on the point noted above, that the refrain is practically everything, the verse being essentially only filler for the sheet music trade. And Franchetti in his April, 1940, transfer warranted in explicit detail that his song was original, which can be true only on the assumption, supported by the surrounding circumstances, that his verse was not written until the need for it arose. In the light of this, the weak general denials of his interrogatories and the strange absence of supporting testimony from Pasternak and his lyricist seem to me pretty

---

does now arise the question, not yet settled, whether faulty publication abroad may be superseded by later correct publication here. Cf. Howell, loc. cit. supra; Ladas, op. cit. supra at 696; Shafter, Musical Copyright, 2d Ed.1939, 118; 18 C.J.S., Copyright and Literary Property, § 25, pp. 166, 167; Italian Book Co. v. Cardilli, D.C.S.D.N.Y., 273 F. 619.

conclusive. Even though the judge did not see or hear the important witnesses, we cannot disregard his findings for that reason, Advisory Committee's Note to F.R. 52(a); 3 Moore's Federal Practice, 1945 Cum.Supp. 116; but I think we are entitled to reject his conclusion because he gave no weight to defendants' failure, with the witnesses obviously available to them, to rebut plaintiff's persuasive case.

I may add that if in Arnstein v. Porter, 2 Cir., 154 F.2d 464, copying could be suggested by mere sound in the case of dissimilar compositions, this exact reproduction, together with evidence of access, would seem to me to show copying a fortiori. This the opinion at first seems to accept, in its various steps refuting the grounds taken below—particularly the claimed defeat of copyright because of similarity to the "Humoreske"—and it supports this result with some intriguing historical allusions, which, however, have relevancy only in support of a reversal.

But ultimately it comes to rest upon a point directly opposed to that taken below, the banality of the music, though the District Court had said of the melody shared between these composers, "There is no lack of ingenuity here." 51 F.Supp. 233. Surely, if the Arnstein case teaches us anything, it must be that banality is no bar to a claim for plagiarism. That results at once so divergent and so musically astonishing as the decisions in these two cases can occur simultaneously I can attribute only to the novel conceptions of legal plagiarism first announced in the Arnstein case and now repeated here. By these the issue is no longer one of musical similarity or identity to justify the conclusion of copying—an issue to be decided with all the intelligence, musical as well as legal, we can bring to bear upon it—but is one, first, of copying, to be decided more or less intelligently, and, second, of illicit copying, to be decided blindly on a mere cacophony of sounds. Just at which stage decision here has occurred, I am not sure.