**SHELDON et al. v. METRO–GOLDWYN PICTURES CORPORATION et al.***

No. 118.

Circuit Court of Appeals, Second Circuit.
Jan. 17, 1936.

O'Brien, Driscoll & Raftery, of New York City (Arthur F. Driscoll, Edward J. Clarke, and Sidney G. Rosenbloom, all of New York City, of counsel), for appellants.

Nathan Burkan and J. Robert Rubin, both of New York City (Louis D. Frohlich, David O. Decker, and Herman Finkelstein, all of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The suit is to enjoin the performance of the picture play, "Letty Lynton," as an infringement of the plaintiffs' copyrighted play, "Dishonored Lady." The plaintiffs' title is conceded, so too the validity of the copyright; the only issue is infringement. The defendants say that they did not use the play in any way to produce the picture; the plaintiffs discredit this denial because of the negotiations between the parties for the purchase of rights in the play, and because the similarities between the two are too specific and detailed to have resulted from chance. The judge thought that, so far as the defendants had used the play, they had taken only what the law allowed, that is, those general themes, motives, or ideas in which there could be no copyright. Therefore he dismissed the bill.

An understanding of the issue involves some description of what was in the public demesne, as well as of the play and the picture. In 1857 a Scotch girl, named Madeleine Smith, living in Glasgow, was brought to trial upon an indictment in three counts; two for attempts to poison her lover, a third for poisoning him. The jury acquitted her on the first count, and brought in a verdict of "Not Proven" on the second and third. The circumstances of the prosecution aroused much interest at the time not only in Scotland but in England; so much indeed that it became a cause célèbre, and that as late as 1927 the whole proceedings were published in book form. An outline of the story so published, which became the original of

*Writ of certiorari denied 56 S. Ct. —, 80 L. Ed. —.

the play here in suit, is as follows: The Smiths were a respectable middle-class family, able to send their daughter to a "young ladies' boarding school"; they supposed her protected not only from any waywardness of her own, but from the wiles of seducers. In both they were mistaken, for when at the age of twenty-one she met a young Jerseyman of French blood, Emile L'Angelier, ten years older, and already the hero of many amorous adventures, she quickly succumbed and poured out her feelings in letters of the utmost ardor and indiscretion, and at times of a candor beyond the standards then, and even yet, permissible for well-nurtured young women. They wrote each other as though already married, he assuming to dictate her conduct and even her feelings; both expected to marry, she on any terms, he with the approval of her family. Nevertheless she soon tired of him and engaged herself to a man some twenty years older who was a better match, but for whom she had no more than a friendly complaisance. L'Angelier was not, however, to be fobbed off so easily; he threatened to expose her to her father by showing her letters. She at first tried to dissuade him by appeals to their tender memories, but finding this useless and thinking herself otherwise undone, she affected a return of her former passion and invited him to visit her again. Whether he did, was the turning point of the trial; the evidence, though it really left the issue in no doubt, was too indirect to satisfy the jury, perhaps in part because of her advocate's argument that to kill him only insured the discovery of her letters. It was shown that she had several times bought or tried to buy poison,—prussic acid and arsenic,—and that twice before his death L'Angelier became violently ill, the second time on the day after her purchase. He died of arsenical poison, which the prosecution charged that she had given him in a cup of chocolate. At her trial, Madeleine being incompétent as a witness, her advocate proved an alibi by the testimony of her younger sister that early on the night of the murder as laid in the indictment, she had gone to bed with Madeleine, who had slept with her throughout the night. As to one of the attempts her betrothed swore that she had been with him at the theatre.

This was the story which the plaintiffs used to build their play. As will appear they took from it but the merest skeleton,

the acquittal of a wanton young woman, who to extricate herself from an amour that stood in the way of a respectable marriage, poisoned her lover. The incidents, the characters, the mis en scène, the sequence of events, were all changed; nobody disputes that the plaintiffs were entitled to their copyright. All that they took from the story they might probably have taken, had it even been copyrighted. Their heroine is named Madeleine Cary; she lives in New York, brought up in affluence, if not in luxury; she is intelligent, voluptuous, ardent and corrupt; but, though she has had a succession of amours, she is capable of genuine affection. Her lover and victim is an Argentinian, named Moreno, who makes his living as a dancer in night-clubs. Madeleine has met him once in Europe before the play opens, has danced with him, has excited his concupiscence; he presses presents upon her. The play opens in his rooms, he and his dancing partner who is also his mistress, are together; Madeleine on the telephone recalls herself to him and says she wishes to visit him, though it is already past midnight. He disposes of his mistress by a device which does not deceive her and receives Madeleine; at once he falls to wooing her, luring her among other devices by singing a Gaucho song. He finds her facile and the curtain falls in season.

The second act is in her home, and introduces her father, a bibulous dotard, who has shot his wife's lover in the long past; Laurence Brennan, a self-made man in the fifties, untutored, self-reliant and reliable, who has had with Madeleine a relation, half paternal, half-amorous since she grew up; and Denis Farnborough, a young British labor peer, a mannekin to delight the heart of well ordered young women. Madeleine loves him; he loves Madeleine; she will give him no chance to declare himself, remembering her mottled past and his supposedly immaculate standards. She confides to Brennan, who makes clear to her the imbecility of her self-denial; she accepts this enlightenment and engages herself to her high-minded paragon after confessing vaguely her evil life and being assured that to post-war generations all such lapses are peccadillo.

In the next act Moreno, who has got wind of the engagement, comes to her house. Disposing of Farnborough, who chances to be there, she admits Moreno, acknowledges that she is to marry Farnborough, and asks him to accept the situa-

tion as the normal outcome of their intrigue. He refuses to be cast off, high words pass, he threatens to expose their relations, she raves at him, until finally he knocks her down and commands her to go to his apartment that morning as before. After he leaves full of swagger, her eye lights on a bottle of strychnine which her father uses as a drug; her fingers slowly close upon it; the audience understands that she will kill Moreno. Farnborough is at the telephone; this apparently stiffens her resolve, showing her the heights she may reach by its execution.

The scene then shifts again to Moreno's apartment; his mistress must again be put out, most unwillingly for she is aware of the situation; Madeleine comes in; she pretends once more to feel warmly, she must wheedle him for he is out of sorts after the quarrel. Meanwhile she prepares to poison him by putting the strychnine in coffee, which she asks him to make ready.. But in the course of these preparations during which he sings her again his Gaucho song, what with their proximity, and this and that, her animal ardors are once more aroused and drag her, unwillingly and protesting, from her purpose. The play must therefore wait for an hour or more until, relieved of her passion, she appears from his bedroom and while breakfasting puts the strychnine in his coffee. He soon discovers what has happened and tries to telephone for help. He does succeed in getting a few words through, but she tears away the wire and fills his dying ears with her hatred and disgust. She then carefully wipes away all traces of her finger prints and manages to get away while the door is being pounded in by those who have come at his call.

The next act is again at her home on the following evening. Things are going well with her and Farnborough and her father, when a district attorney comes in, a familiar of the household, now in stern mood; Moreno's mistress and a waiter have incriminated Madeleine, and a cross has been found in Moreno's pocket, which he superstitiously took off her neck the night before. The district attorney cross-questions her, during which Farnborough several times fatuously intervenes; she is driven from point to point almost to an avowal when as a desperate plunge she says she spent the night with Brennan. Brennan is brought to the house and, catching the situation after a moment's delay, bears her out. This puts off the district attorney until seeing strychnine brought to relieve the father, his suspicions spring up again and he arrests Madeleine. The rest of the play is of no consequence here, except that it appears in the last scene that at the trial where she is acquitted, her father on the witness stand accounts for the absence of the bottle of strychnine which had been used to poison Moreno.

At about the time that this play was being written an English woman named Lowndes wrote a book called Letty Lynton, also founded on the story of Madeleine Smith. Letty Lynton lives in England; she is eighteen years old, beautiful, well-reared and intelligent, but wayward. She has had a more or less equivocal love affair with a young Scot, named McLean, who worked in her father's chemical factory, but has discarded him, apparently before their love-making had gone very far. Then she chances upon a young Swede— half English—named Ekebon, and their acquaintance quickly becomes a standardized amour, kept secret from her parents, especially her mother, who is an uncompromising moralist, and somewhat estranged from Letty anyway. She and her lover use an old barn as their place of assignation; it had been fitted up as a play house for Letty when she was a child. Like Madeleine Smith she had written her lover a series of indiscreet letters which he has kept, for though he is on pleasure bent Ekebon has a frugal mind, and means to marry his sweetheart and set himself up for life. They are betrothed and he keeps pressing her to declare it to her parents, which she means never to do. While he is away in Sweden Letty meets an unmarried peer considerably older than she, poor, but intelligent and charming; he falls in love with her and she accepts him, more because it is a good match than for any other reason, though she likes him well enough, and will make him suppose that she loves him.

Thereupon Ekebon reappears, learns of Letty's new betrothal, and threatens to disclose his own to her father, backing up his story with her letters. She must at once disown her peer and resume her engagement with him. His motive, like L'Angelier's, is ambition rather than love, though conquest is a flattery and Letty a charming morsel. His threats naturally throw Letty into dismay; she has come to

loathe him and at any cost must get free, but she has no one to turn to. In her plight she thinks of her old suitor, McLean, and goes to the factory only to find him gone. He has taught her how to get access to poisons in his office and has told of their effect on human beings. At first she thinks of jumping out the window, and when she winces at that, of poisoning herself; that would be easier. So she selects arsenic which is less painful and goes away with it; it is only when she gets home that she thinks of poisoning Ekebon. Her mind is soon made up, however, and she makes an appointment with him at the barn; she has told her father, she writes, and Ekebon is to see him on Monday, but meanwhile on Sunday they will meet secretly once more. She has prepared to go on a week-end party and conceals her car near the barn. He comes; she welcomes him with a pretence of her former ardors, and tries to get back her letters. Unsuccessful in this she persuades him to drink a cup of chocolate into which she puts the arsenic. After carefully washing the pans and cups, she leaves with him, dropping him from her car near his home; he being still unaffected. On her way to her party she pretends to have broken down and by asking the help of a passing cyclist establishes an alibi. Ekebon dies at his home attended by his mistress; the letters are discovered and Letty is brought before the coroner's inquest and acquitted chiefly through the alibi, for things look very bad for her until the cyclist appears.

The defendants, who are engaged in producing speaking films on a very large scale in Hollywood, California, had seen the play and wished to get the rights. They found, however, an obstacle in an association of motion picture producers presided over by Mr. Will Hays, who thought the play obscene; not being able to overcome his objections, they returned the copy of the manuscript which they had had. That was in the spring of 1930, but in the autumn they induced the plaintiffs to get up a scenario, which they hoped might pass moral muster. Although this did not suit them after the plaintiffs prepared it, they must still have thought in the spring of 1931 that they could satisfy Mr. Hays, for they then procured an offer from the plaintiffs to sell their rights for $30,000. These negotiations also proved abortive because the play continued to be objectionable, and eventually they cried off on the bargain. Mrs. Lowndes' novel was suggested to Thalberg, one of the vice-presidents of the Metro-Goldwyn Company, in July, 1931, and again in the following November, and he bought the rights to it in December. At once he assigned the preparation of a play to Stromberg, who had read the novel in January, and thought it would make a suitable play for an actress named, Crawford, just then not employed. Stromberg chose Meehan, Tuchock and Brown to help him, the first two with the scenario, the third with the dramatic production. All these four were examined by deposition; all denied that they had used the play in any way whatever; all agreed that they had based the picture on the story of Madeleine Smith and on the novel, "Letty Lynton." All had seen the play, and Tuchock had read the manuscript, as had Thalberg, but Stromberg, Meehan and Brown swore that they had not; Stromberg's denial being however worthless, for he had originally sworn the contrary in an affidavit. They all say that work began late in November or early in December, 1931, and the picture was finished by the end of March. To meet these denials, the plaintiffs appeal to the substantial identity between passages in the picture and those parts of the play which are original with them.

The picture opens in Montevideo where Letty Lynton is recovering from her fondness for Emile Renaul. She is rich, luxurious and fatherless, her father having been killed by his mistress's husband; her mother is seared, hard, selfish, unmotherly; and Letty has left home to escape her, wandering about in search of excitement. Apparently for the good part of a year she has been carrying on a love affair with Renaul; twice before she has tried to shake loose, has gone once to Rio where she lit another flame, but each time she has weakened and been drawn back. Though not fully declared as an amour, there can be no real question as to the character of her attachment. She at length determines really to break loose, but once again her senses are too much for her and it is indicated, if not declared, that she spends the night with Renaul. Though he is left a vague figure only indistinctly associated with South America somewhere or other, the part was cast for an actor with a marked foreign accent, and it is plain that he was meant to be under-

stood, in origin anyway, as South American, like Moreno in the play. He is violent, possessive and sensual; his power over Letty lies in his strong animal attractions. However, she escapes in the morning while he is asleep, whether from his bed or not is perhaps uncertain; and with a wax figure in the form of a loyal maid—Letty in the novel had one—boards a steamer for New York. On board she meets Darrow, a young American, the son of a rich rubber manufacturer, who is coming back from a trip to Africa. They fall in love upon the faintest provocation and become betrothed before the ship docks, three weeks after she left Montevideo. At the pier she finds Renaul who has flown up to reclaim her. She must in some way keep her two suitors apart, and she manages to dismiss Darrow and then to escape Renaul by asking him to pay her customs duties, which he does. Arrived home her mother gives her a cold welcome and refuses to concern herself with the girl's betrothal. Renaul is announced; he has read of the betrothal in the papers and is furious. He tries again to stir her sensuality by the familiar gambit, but this time he fails; she slaps his face and declares that she hates him. He commands her to come to his apartment that evening; she begs him to part with her and let her have her life; he insists on renewing their affair. She threatens to call the police; he rejoins that if so her letters will be published, and then he leaves. Desperate, she chances on a bottle of strychnine, which we are to suppose is an accoutrement of every affluent household, and seizes it; the implication is of intended suicide, not murder. Then she calls Darrow, tells him that she will not leave with him that night for his parents' place in the Adirondacks as they had planned; she renews to him the pledge of her love, without him she cannot live, an intimation to the audience of her purpose to kill herself.

That evening she goes to Renaul's apartment in a hotel armed with her strychnine bottle, for use on the spot; she finds him cooling champagne, but in bad temper. His caresses which he bestows plentifully enough, again stir her disgust not her passions, but he does not believe it and assumes that she will spend the night with him. Finding that he will not return the letters, she believes herself lost and empties the strychnine into a wine glass. Again he embraces her; she vilifies him; he knocks her down; she vilifies him again. Ignorant of the poison he grasps her glass, and she, perceiving it, lets him drink. He woos her again, this time with more apparent success, for she is terrified; he sings a Gaucho song to her, the same one that has been heard at Montevideo. The poison begins to work and, at length supposing that she has meant to murder him, he reaches for the telephone; she forestalls him, but she does not tear out the wire. As he slowly dies, she stands over him and vituperates him. A waiter enters; she steps behind a curtain; he leaves thinking Renaul drunk; she comes out, wipes off all traces of her fingerprints and goes out, leaving however her rubbers which Renaul had taken from her when she entered.

Next she and Darrow are found at his parents' in the Adirondacks; while there a detective appears, arrests Letty and takes her to New York; she is charged with the murder of Renaul; Darrow goes back to New York with her. The finish is at the district attorney's office; Letty and Darrow, Letty's mother, the wax serving maid are all there. The letters appear incriminating to an elderly rather benevolent district attorney; also the customs slip and the rubbers. Letty begins to break down; she admits that she went to Renaul's room, not to kill him but to get him to release her. Darrow sees that that story will not pass, and volunteers that she came to his room at a hotel and spent the night with him. Letty confirms this and mother, till then silent, backs up their story; she had traced them to the hotel and saw the lights go out, having ineffectually tried to dissuade them. The maid still further confirms them and the district attorney, not sorry to be discomfited, though unbelieving, discharges Letty.

We are to remember that it makes no difference how far the play was anticipated by works in the public demesne which the plaintiffs did not use. The defendants appear not to recognize this, for they have filled the record with earlier instances of the same dramatic incidents and devices, as though, like a patent, a copyrighted work must be not only original, but new. That is not however the law as is obvious in the case of maps or compendia, where later works will necessarily be anticipated. At times, in discussing how much of the substance of a play the copyright protects, courts have indeed used language which

seems to give countenance to the notion that, if a plot were old, it could not be copyrighted. London v. Biograph Co. (C. C.A.) 231 F. 696; Eichel v. Marcin (D.C.) 241 F. 404. But we understand by this no more than that in its broader outline a plot is never copyrightable, for it is plain beyond peradventure that anticipation as such cannot invalidate a copyright. Borrowed the work must indeed not be, for a plagiarist is not himself pro tanto an "author"; but if by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an "author," and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats's. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 23 S.Ct. 298, 47 L.Ed. 460; Gerlach-Barklow Co. v. Morris & Bendien, Inc., 23 F.(2d) 159, 161 (C.C.A.2); Weil, Copyright Law, p. 234. But though a copyright is for this reason less vulnerable than a patent, the owner's protection is more limited, for just as he is no less an "author" because others have preceded him, so another who follows him, is not a tort-feasor unless he pirates his work. Jewelers' Circular Publishing Co. v. Keystone Co., 281 F. 83, 92, 26 A.L.R. 571 (C. C.A.2); General Drafting Co. v. Andrews, 37 F.(2d) 54, 56 (C.C.A.2); Williams v. Smythe (C.C.) 110 F. 961; American, etc., Directory Co. v. Gehring Pub. Co. (D.C.) 4 F.(2d) 415; New Jersey, etc., Co. v. Barton Business Service (D.C.) 57 F.(2d) 353. If the copyrighted work is therefore original, the public demesne is important only on the issue of infringement; that is, so far as it may break the force of the inference to be drawn from likenesses between the work and the putative piracy. If the defendant has had access to other material which would have served him as well, his disclaimer becomes more plausible.

In the case at bar there are then two questions: First, whether the defendants actually used the play; second, if so, whether theirs was a "fair use." The judge did not make any finding upon the first question, as we said at the outset, because he thought the defendants were in any case justified; in this following our decision in Nichols v. Universal Pictures Corporation, 45 F.(2d) 119. The plaintiffs challenge that opinion because we said that "copying" might at times be a "fair use"; but it is convenient to define such a use by saying that others may "copy" the "theme," or "ideas," or the like, of a work, though not its "expression." At any rate so long as it is clear what is meant, no harm is done. In the case at bar the distinction is not so important as usual, because so much of the play was borrowed from the story of Madeleine Smith, and the plaintiffs' originality is necessarily limited to the variants they introduced. Nevertheless, it is still true that their whole contribution may not be protected; for the defendants were entitled to use, not only all that had gone before, but even the plaintiffs' contribution itself, if they drew from it only the more general patterns; that is, if they kept clear of its "expression." We must therefore state in detail those similarities which seem to us to pass the limits of "fair use." Finally, in concluding as we do that the defendants used the play pro tanto, we need not charge their witnesses with perjury. With so many sources before them they might quite honestly forget what they took; nobody knows the origin of his inventions; memory and fancy merge even in adults. Yet unconscious plagiarism is actionable quite as much as deliberate. Buck v. Jewell-La Salle Realty Co., 283 U. S. 191, 198, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266; Harold Lloyd Corporation v. Witwer, 65 F.(2d) 1, 16 (C.C.A.9); Fred Fisher, Inc., v. Dillingham (D.C.) 298 F. 145.

The defendants took for their mis en scène the same city and the same social class; and they chose a South American villain. The heroines had indeed to be wanton, but Letty Lynton "tracked" Madeleine Cary more closely than that. She is overcome by passion in the first part of the picture and yields after announcing that she hates Renaul and has made up her mind to leave him. This is the same weakness as in the murder scene of the play, though transposed. Each heroine's waywardness is suggested as an inherited disposition; each has had an errant parent involved in scandal; one killed, the other becoming an outcast. Each is redeemed by a higher love. Madeleine Cary must not be misread; it is true that her lust overcomes her at the critical moment, but it does not extinguish her love for Farnborough; her body, not her soul, consents to her lapse. Moreover, her later avowal, which she knew would finally lose her her lover, is meant to show the basic rectitude of her nature. Though it does

not need Darrow to cure Letty of her wanton ways, she too is redeemed by a nobler love. Neither Madeleine Smith, nor the Letty of the novel, were at all like that; they wished to shake off a clandestine intrigue to set themselves up in the world; their love as distinct from their lust, was pallid. So much for the similarity in character.

Coming to the parallelism of incident, the threat scene is carried out with almost exactly the same sequence of event and actuation; it has no prototype in either story or novel. Neither Ekebon nor L'Angelier went to his fatal interview to break up the new betrothal; he was beguiled by the pretence of a renewed affection. Moreno and Renaul each goes to his sweetheart's home to detach her from her new love; when he is there, she appeals to his better side, unsuccessfully; she abuses him, he returns the abuse and commands her to come to his rooms; she pretends to agree, expecting to finish with him one way or another. True, the assault is deferred in the picture from this scene to the next, but it is the same dramatic trick. Again, the poison in each case is found at home, and the girl talks with her betrothed just after the villain has left and again pledges him her faith. Surely the sequence of these details is pro tanto the very web of the authors' dramatic expression; and copying them is not "fair use."

The death scene follows the play even more closely; the girl goes to the villain's room as he directs; from the outset he is plainly to be poisoned while they are together. (The defendants deny that this is apparent in the picture, but we cannot agree. It would have been an impossible dénoument on the screen for the heroine, just plighted to the hero, to kill herself in desperation, because the villain has successfully enmeshed her in their mutual past; yet the poison is surely to be used on some one.) Moreno and Renaul each tries to arouse the girl by the memory of their former love, using among other aphrodisiacs the Gaucho song; each dies while she is there, incidentally of strychnine not arsenic. In extremis each makes for the telephone and is thwarted by the girl; as he dies, she pours upon him her rage and loathing. When he is dead, she follows the same ritual to eradicate all traces of her presence, but forgets telltale bits of property. Again these details in the same sequence embody more than the "ideas" of the play; they are its very raiment.

Finally in both play and picture in place of a trial, as in the story and the novel, there is substituted an examination by a district attorney; and this examination is again in parallel almost step by step. A parent is present; so is the lover; the girl yields progressively as the evidence accumulates; in the picture, the customs slip, the rubbers and the letters; in the play, the cross and the witnesses, brought in to confront her. She is at the breaking point when she is saved by substantially the same most unexpected alibi; a man declares that she has spent the night with him. That alibi there introduced is the turning point in each drama and alone prevents its ending in accordance with the classic canon of tragedy; i. e., fate as an inevitable consequence of past conduct, itself not evil enough to quench pity. It is the essence of the authors' expression, the very voice with which they speak.

■■ We have often decided that a play may be pirated without using the dialogue. Daly v. Palmer, Fed.Cas. No. 3,552, 6 Blatch. 256; Daly v. Webster, 56 F. 483, 486, 487; Dam v. Kirke La Shelle Co., 175 F. 902, 907, 41 L.R.A.(N.S.) 1002, 20 Ann. Cas. 1173; Chappell & Co. v. Fields, 210 F. 864. Dymow v. Bolton, 11 F.(2d) 690; and Nichols v. Universal Pictures Corporation, supra, 45 F.(2d) 119, do not suggest otherwise. Were it not so, there could be no piracy of a pantomime, where there cannot be any dialogue; yet nobody would deny to pantomime the name of drama. Speech is only a small part of a dramatist's means of expression; he draws on all the arts and compounds his play from words and gestures and scenery and costume and from the very looks of the actors themselves. Again and again a play may lapse into pantomime at its most poignant and significant moments; a nod, a movement of the hand, a pause, may tell the audience more than words could tell. To be sure, not all this is always copyrighted, though there is no reason why it may not be, for those decisions do not forbid which hold that mere scenic tricks will not be protected. Serrana v. Jefferson (C.C.) 33 F. 347; Barnes v. Miner (C.C.) 122 F. 480; Bloom et al. v. Nixon (C.C.) 125 F. 977. The play is the sequence of the confluents of all these means, bound together in an inseparable

unity; it may often be most effectively pirated by leaving out the speech, for which a substitute can be found, which keeps the whole dramatic meaning. That as it appears to us is exactly what the defendants have done here; the dramatic significance of the scenes we have recited is the same, almost to the letter. True, much of the picture owes nothing to the play; some of it is plainly drawn from the novel; but that is entirely immaterial; it is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate. We cannot avoid the conviction that, if the picture was not an infringement of the play, there can be none short of taking the dialogue.

The decree will be reversed and an injunction will go against the picture together with a decree for damages and an accounting. The plaintiffs will be awarded an attorney's fee in this court and in the court below, both to be fixed by the District Court upon the final decree.

Decree reversed.