**Granville BURGESS, Plaintiff,**

v.

**Barbara CHASE–RIBOUD, Defendant.**

**Civ. A. No. 89–8531.**

United States District Court,
E.D. Pennsylvania.

May 28, 1991.

Carl T. Bogus, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for plaintiff.

Alison Douglas Knox, Philadelphia, Pa., for defendant.

Barbara Chase–Riboud, pro se.

MEMORANDUM

ROBERT F. KELLY, District Judge.

Speculation about the private lives of public figures has been a popular pastime in this country for as long as there have been newspapers, but it is a rare occurrence when a story which originated as an item of malicious gossip in the early 1800's becomes the basis of a lawsuit nearly 200 years later.

The public figure in this story is Thomas Jefferson, and the starting point in this copyright infringement case is an accusation which incited a political uproar when it was first published in a Virginia newspaper in September 1802, that Jefferson had a slave "concubine" named Sally Hemings at Monticello, his Virginia plantation, who had born him a number of "mulatto" children.

A biography of Thomas Jefferson which was published in 1974 revitalized the Sally Hemings story, and in 1979 Barbara Chase–Riboud, the defendant in this case, wrote a novel based on the story called *Sally Hemings: A Novel.* In 1982, Gran-

ville Burgess, the plaintiff, wrote a play on the same subject entitled *Dusky Sally*.

*Dusky Sally* was about to be produced at the Walnut Street Theater in Philadelphia in 1988, when Chase–Riboud, through her publisher, her agent, and her law firm, sent what Burgess describes as "a flurry of letters" alleging that *Dusky Sally* infringed on Chase–Riboud's copyright of *Sally Hemings*. Burgess maintains that Chase–Riboud's actions ruined the marketability of his play. Burgess filed this lawsuit seeking a declaratory judgment that *Dusky Sally* did not infringe on Chase–Riboud's copyright of *Sally Hemings*. Chase–Riboud eventually filed a counterclaim asking for a judgment that it did.

One of Burgess's primary arguments is that he did not infringe on Chase–Riboud's book because the Sally Hemings story is a matter of historical record, and does not belong to Chase–Riboud or anyone else. This makes it important to examine the historical record itself.

The 1802 Accusations

Politics in the early 1800's was a rough and tumble business, but even under the rollicking standards of that era the political campaign of 1802 has been described by one historian as "an outburst of reciprocal invective and slander as could not be matched in American history."[1] Thomas Jefferson was in the second year of his first term as president. Jefferson's Republican party was battling the Federalist party, and the nation was torn by political and regional infighting. The following is an excerpt from a story which appeared in a Richmond newspaper in September of 1802:

It is well known that [Jefferson] keeps, and has kept, as his concubine, one of his slaves. Her name is SALLY. The name of her eldest son is Tom. His features are said to bear a striking though sable resemblance to those of the president himself ... There is not an individual in the neighborhood of Charlottesville who does not believe the story, and not a few who know it ...[2]

Public reaction to the story broke down on strict party lines. Jefferson's enemies were delighted, and his followers were outraged. Other than describing his accuser as a "lying renegade" and the story itself as "calumny," Jefferson never specifically responded to the story about Sally Hemings.

In the years since 1802, the treatment of the story has been similar to the reaction at the time it was published. The story has been denounced by Jefferson's admirers, which includes most of his biographers, and has been given credence by others.[3]

It is an historical fact that Sally Hemings existed, that she was a mulatto slave owned by Jefferson, and that she gave birth to a number of light-skinned children out of wedlock. Jefferson was the American minister to France from 1784 to 1789,

**1.** *See* Henry Adams, *History of the United States of America During the Administration of Thomas Jefferson,* (The Library of America, New York, N.Y., 1986) [originally published, 1889–91] at 219.

**2.** Richmond Recorder, September 1, 1802. The author of this article was James T. Callender, a Scottish-born journalist who had achieved notoriety prior to 1802 by his attacks on many of Jefferson's Federalist rivals. This is not the place for an account of the "Callender scandal," except to say that Jefferson and his allies had encouraged and appreciated Callender's previous work, and had even provided Callender with information and money. Callender turned his guns on Jefferson when Jefferson and his two foremost lieutenants, James Madison and James Monroe, balked at rewarding Callender with a political appointment (postmaster of Richmond) Callender felt his past work had earned. Callender retaliated by, to use a 20th century expression, "going public" with a story that recounted several rumors about Jefferson's personal life, of which the Sally Hemings story was only one. *See* Henry Adams at 219–21.

**3.** The story was discredited in the standard biography of Jefferson, *Jefferson and His Time* by Dumas Malone (6 vols; Little Brown, Boston, 1948–81) and was rebutted at length in *The Jefferson Scandals* by Virginius Dabney (Dodd, Mead & Co., New York, 1981), which declared that the father of Sally Hemings' children had been one or more of Jefferson's nephews, who were frequent visitors to Monticello. This explanation had long been the position of Jefferson's family.

Sally Hemings, who lived until 1830, four years after Jefferson, never commented on the story, and apparently was never even asked about it.

and in May 1787 Sally Hemings accompanied Jefferson's youngest daughter Maria (usually called "Polly") when she travelled to join her father in France. Polly Jefferson and Sally Hemings arrived in Paris in July 1787. Jefferson lived in Paris with his two daughters, Martha (usually called "Patsy") and Polly, and Sally Hemings and her brother James Hemings also lived in the house. Sally Hemings was approximately 15 years old in 1787. James (or "Jimmy") Hemings, Sally's brother, had accompanied Jefferson and Patsy Jefferson to Paris in 1784. Sally Hemings returned to America with the rest of Jefferson's household in 1789 when Jefferson returned to become President Washington's Secretary of State, and remained a slave until Jefferson's death in 1826, when she was freed by Patsy Jefferson.

It is also a fact that there are no surviving letters from Jefferson to Sally Hemings. There is no evidence that Sally Hemings could read or write. There is not a single reference to Sally Hemings in any of the hundreds of letters of Jefferson's that survive.[4]

The bicentennial of the Declaration of Independence brought about a renewed interests in many of the leaders of that period, and with that interest came several books which sought to take new look at the founding fathers. Among them was Fawn M. Brodie's *Thomas Jefferson: An Intimate History.*[5]

The Brodie Biography of Jefferson

Brodie wrote that while others had written about Jefferson and "centered upon his luminous mind and its impact on society," she would take a different approach. In her opening chapter, entitled "The Semi-Transparent Shadows," Brodie wrote that "this is a book about Jefferson and the life

of the heart ... Once one accepts the premise that a man's inner life has a continuing impact on his public life, then the whole unfolding tapestry of Jefferson's life is remarkably illuminated."[6]

Thomas Jefferson's "inner life" is not the issue in this case, nor is his reputation. The debate on the adequacy of Brodie's technique and scholarship and the Sally Hemings story itself will undoubtedly continue. But both plaintiff and defendant to this lawsuit cite Brodie's "psychological biography" of Jefferson as the basis for their works of fiction, and so *Thomas Jefferson: An Intimate History* requires particular attention in this opinion.

Brodie's book endorsed the accepted view that Jefferson was a private, reserved man, but argued that the only way to understand the "inner" Jefferson was to read between the lines of the thousands of pages of letters and papers Jefferson left behind, and apply a psychological interpretation of them.

Borrowing deeply from the writings of Sigmund Freud, Brodie analyzed some of Jefferson's writings during a period in Paris in 1787 when Sally Hemings was living in his house. Brodie noted eight references to "mulatto" in several descriptions of his travels around Europe, while he had only used "mulatto" twice before Sally Hemings arrived in Paris.

Brodie took note of a number of domestic developments, which were recorded in Jefferson's journals and letters: Jefferson ordered a book about African pygmies from a London book store. Jefferson bought Sally Hemings new clothes, and had her tutored in french. Jefferson's oldest daughter Patsy was disturbed by what she saw as the immorality of Parisian society, and was

---

**4.** The most recent biography of Jefferson states that "it is impossible to find in Jefferson's voluminous papers any indication that the arrival of Sally Hemings in Paris made any difference in his life ... The evidence indicates that any Paris romance between Jefferson and Sally Hemings belongs in a work of fiction, not history." *See In Pursuit of Reason: The Life of Thomas Jefferson* by Noble E. Cunningham, Jr. (Louisiana State University Press, Baton Rouge and London, 1987) at 115–16.

**5.** The Brodie book was originally published in hardcover in 1974 by W.W. Norton & Co. However, I will refer throughout this opinion to the more readily available paperback edition of the book, first published by Bantam Books in 1975.

**6.** *See* Brodie's *Thomas Jefferson*, preface at xi; 17–19.

thinking about becoming a nun. Jefferson was reluctant to leave Paris and return to America. Jefferson was receiving treatment for migraine headaches.

And finally, Brodie considered the rumors about Jefferson and Sally Hemings which became public in 1802. Brodie wrote that "the most important single document" about the alleged relationship were the recollections of Sally Hemings' son Madison, which were published in 1872 in the Pike County (Ohio) Republican.

These recollections were purportedly a narrative of Madison Hemings' family history, both before and after his mother's alleged relationship with Jefferson. Madison Hemings wrote that his mother accompanied Jefferson's younger daughter Maria to Paris as her "body servant:"

Their stay (my mother's and Maria's) was about eighteen months. But during that time my mother became Mr. Jefferson's concubine, and when he was called back home she was *enceinte* by him. *See* "Reminiscences of Madison Hemings," Appendix I, Part 1, in Brodie's *Thomas Jefferson.*

The account went on to state that Jefferson wanted to bring his mother back to Virginia, but she "demurred" because she was beginning to understand French and was free in France, and she knew she would be "re-slaved" if she returned to Virginia. In order to obtain her consent to return, Madison Hemings wrote, Jefferson "promised her extraordinary privileges, and made a solemn pledge that her children would be freed at the age of twenty-one years." Sally Hemings then agreed to return to Monticello, and although the baby she was carrying "lived but a short time," she eventually gave birth to four children by Jefferson, of which Madison Hemings was one. *Id.*

Brodie completed her analysis of this story by observing that although Jefferson had been grief-stricken over the early death of his wife, who had died in 1782,

there was "overwhelming evidence of his continuing capacity to love." She added that "many believe the historical Jefferson to be a man of great sexual vitality." [7]

From these seemingly unconnected details, rumors, and opinions, Brodie made a series of startling inferences: that the references to "mulatto" and the book about Africa indicated that Jefferson was obsessed with Sally Hemings during this period; that his daughter's spiritual crisis suggested that she had discovered her father's relationship with Sally Hemings and had been so appalled that she wanted to enter a convent; that the real reason Jefferson did not want to return to America was that it would end his intimacy with Sally Hemings; and that the turmoil and potential risk of this taboo relationship had caused Jefferson a great deal of tension, bringing about the migraines which would plague him the rest of his life.

Brodie concluded that "unless material hitherto lost or suppressed comes to light, we must remain forever baffled." Nevertheless, when Brodie combined what is known about Sally Hemings, the rumors about her and Jefferson, and added the psychological detective work provided above, she concluded that the rumored relationship was a reality and that Jefferson was the father of Sally Hemings' children.

It was "not scandalous debauchery," Brodie wrote, but "a serious passion that brought Jefferson and the slave woman much private happiness over a period lasting thirty-eight years." [8] Brodie's book became a national best-seller.[9]

### The *Sally Hemings—Dusky Sally* Dispute

Five years after the publication of *Thomas Jefferson: An Intimate History,* the Viking Press published Barbara Chase–Riboud's novel, *Sally Hemings.* The book was Chase–Riboud's first novel, although she had been recognized in artistic circles as a poet and sculptor prior to 1979. Chase–Riboud was born in Philadelphia,

---

7. *See* Brodie's *Thomas Jefferson* at 12, 16.

8. *See* Brodie's *Thomas Jefferson* at 17.

9. Fawn Brodie died in 1980. Her final book was a "psychological biography" of Richard M. Nixon, entitled *Richard Nixon: The Shaping of His Character,* which was published in 1981.

but currently resides in Paris and is a citizen of France. The novel received a great deal of public attention and critical approval. It was named a selection of the Literary Guild. *Sally Hemings* received a copyright in 1979. In 1980, *Sally Hemings* was issued in paperback by Avon Books.

In 1982, Granville Burgess, a playwright with a number of productions, wrote *Dusky Sally*. Burgess received a copyright for *Dusky Sally* in 1982. According to Burgess, the play had "bright prospects." [10] It won several new play competitions, and was published in paperback form in 1987.

In February 1988, as Burgess chose to put it in his motion for summary judgment, "just as *Dusky Sally* was opening on the main stage at the Walnut Street Theater— defendant's agent, publisher and lawyers sent a flurry of letters alleging that *Dusky Sally* contained substantial similarities to *Sally Hemings* and infringed on defendant's copyright ... This letter campaign slammed the door on *Dusky Sally*'s future." [11]

Burgess states that he was faced with a "Hobson's choice of either allowing theatrical companies to produce *Dusky Sally* without knowing about defendant's threat of legal proceedings, or of disclosing her threat and thereby further disseminating her allegations of plagiarism." Burgess decided not to authorize any further productions of *Dusky Sally*.

This lawsuit was filed on November 29, 1989.[12] Burgess asserts that *Dusky Sally* is "an entirely original work," based on the

historical record "with artistic deviations." Chase–Riboud's allegations, according the complain, had "placed a cloud over *Dusky Sally*, made producers afraid of becoming entangled in legal proceedings if the produce it, crippled its marketability and greatly diminished the value of plaintiff's rights to his play." [13]

Chase–Riboud asserts that she first heard of Burgess' play in 1986, when it was being performed in Albany, New York.[14] When she learned of the Walnut Street Theater production in February 1988, she responded by mounting the "letter campaign" described in the complaint.

It would be fair to say that this case proceeded at a very deliberate pace. Chase–Riboud acted *pro se* for the first nine months of the litigation, and directed her case from her distant domicile in France, which created a certain amount of communication difficulties. Chase–Riboud obtained representation on August 30, 1990. In as much as the evidence in this case consists almost entirely of the two works, which meant that there were no serious discovery difficulties, it seemed particularly suited for disposition by cross-summary judgment.[15] Nevertheless, counsel for Burgess' did not submit a motion for summary judgment until February 26, 1991. Counsel for Chase–Riboud responded with a cross-motion for summary judgment on March 28, 1991.

Interrogatory No. 16

The field of battle in this case is Burgess' Interrogatory No. 16, which asked, "Do you contend that plaintiff's play,

**10.** *See* Burgess' Motion for Summary Judgment at 7.

**11.** Burgess' motion for summary judgment at 7. The letters were sent to Burgess, his agent, and his publishing company.

**12.** Burgess originally named Chase–Riboud's publisher, The Hearst Corporation, her agent, Slade R. Metcalf, and her attorneys, the New York firm of Squadron, Ellennoff, Plesent & Lehrer as defendants, but dropped them when an amended complaint was filed on January 11, 1990.

**13.** *See* Complaint, ¶ 24. The complaint has three counts: count one seeks a declaratory judgment that *Dusky Sally* does not infringe

upon *Sally Hemings*'s copyright; count two is for trade libel, commercial disparagement, and disparagement of title; and count three alleges intention interference with contract; misrepresentation; and unfair competition and tort damages.

**14.** Chase–Riboud has stated that friends sent her newspaper clippings of Burgess' play, saying it was a "rip-off" of *Sally Hemings*.

**15.** With his motion for summary judgment, Burgess has also withdrawn his demand for a jury trial. *See* Burgess' motion for summary judgement at 3.

*Dusky Sally,* infringes on your copyright to *Sally Hemings, A Novel?* If so, describe with particularity each way in which you contend *Dusky Sally* infringes on *Sally Hemings, A Novel.*" Chase–Riboud responded listing 21 instances of alleged infringement. These consist of scenes which appear in both works, and can be divided into three general categories:

SALLY HEMINGS AND THOMAS JEFFERSON

1. Sally Hemings and Polly Jefferson's arrival in Paris. Chase–Riboud at 1–7; Burgess at 83–86.

2. Jefferson's teaching Sally Hemings to make lists, or name flowers, in order to control unhappiness or anxiety. Chase–Riboud at 14, 87; Burgess at 61–62; 65–66.

3. Sally Hemings' massaging of Jefferson's injured wrist. Chase–Riboud at 86–87; Burgess at 14–15.

4. The first sexual contact between Jefferson and Sally Hemings. Chase–Riboud at 101–03; Burgess at 34–35.

5. Jefferson's letter to Sally Hemings from Dusseldorf. Chase–Riboud at 109–13; Burgess at 38–39, 41, 59, 87.

6. Sally Hemings learns to speak French. Chase–Riboud at 95–96; Burgess at 24–25, 41.

7. Jefferson's promise to Sally Hemings that they would return to live in France. Chase–Riboud at 55; Burgess at 147–49, 178.

8. Jefferson promises Sally Hemings that there will be no "white mistress" at Monticello to outrank her. Chase–Riboud at 185, 236–37; Burgess at 46–47.

9. Sally Hemings' changing complexion. Chase–Riboud at 65; Burgess at 82.

10. Jefferson's invitation to Sally Hemings to call him by his first name. Chase–Riboud at 208–09; Burgess at 47.

11. Jefferson's promise to Sally Hemings that she and their children would be freed. Chase–Riboud at 143; Burgess at 47.

12. Jefferson's discussion with James Madison about the "Callender scandals."

Chase–Riboud at 251–53; Burgess at 71–73.

13. Sally Hemings' dream about Jefferson being sold at a slave auction. Chase–Riboud at 335–38; Burgess at 76–78.

SALLY HEMINGS AND PATSY JEFFERSON

14. The relationship between Sally Hemings and Patsy Jefferson. Chase–Riboud at 83–86; Burgess at 1–2, 5–7.

15. Sally Hemings and Patsy Jefferson play together in Paris. Chase–Riboud at 105–08, 188; Burgess at 19–20.

16. The significance of the household keys at Monticello. Chase–Riboud at 235, 247; Burgess at 52–53.

17. Sally Hemings is ordered to act as a wet nurse to Patsy Jefferson's baby. Chase–Riboud at 238–39; Burgess at 54–56.

SALLY HEMINGS AND JAMES HEMINGS

18. James Hemings tells Sally Hemings that they are legally free on French soil. Chase–Riboud at 85, 89–91, 120–22, 142–43; Burgess at 7, 42–43.

19. James Hemings participates in the storming of the Bastille. Chase–Riboud at 136–39; Burgess at 42–45.

20. James Hemings asks Sally Hemings to escape with him from Monticello. Chase–Riboud at 225–29; Burgess at 65–70.

21. James Hemings contemplates killing Jefferson. Chase–Riboud at 104–05; Burgess at 70.

Proof of Copyright Infringement

Any discussion of copyright infringement in this circuit must begin with the Court of Appeals' decision in *Whelan Associates v. Jaslow Dental Laboratory,* 797 F.2d 1222, 1231 (3d Cir.1987). There are two basic elements to a copyright infringement case: the moving party must show that they owned a valid copyright and that the opposing party copied the moving party's work. *Id. See e.g., Allen–Myland, Inc. v. International Business Machines Corporation,* 746 F.Supp. 520, 530 (E.D.Pa.1990).

■ The Court of Appeals observed in *Whelan Associates* that it is rarely possible to prove copying through direct evidence. But copying may be proved inferentially by a showing that the defendant had access to the allegedly infringed copyrighted work, and the allegedly infringing work is substantially similar to the copyrighted work. *Whelan Associates*, supra, at 1232–31.

The Third Circuit has followed the bifurcated test established in *Arnstein v. Porter*, 154 F.2d 464, 468–69 (2d Cir.1946) to determine substantial similarity. The first part of this test involves making a decision whether the two works are sufficiently similar so as to support a conclusion that the alleged infringer used the copyrighted work. The second part of the test is whether, using a so-called "ordinary observer" test, the copying was "illicit" or "an unlawful appropriation" of the copyrighted work. The ordinary observer test has been used over the years in cases involving alleged substantial similarity in novels, plays and paintings. *Whelan Associates*, supra at 1232–33.

Perhaps the most elusive concept in copyright infringement law is the deceptively straightforward statement that a copyright does not protect ideas, only the expression of ideas. *Whelan Associates*, supra, at 1234. Many courts over the years have wrestled with the notion of what separates an "idea" from an "expression." *Whelan Associates* involved what has become a fairly commonplace occurrence in copyright infringement, an alleged infringement of computer programming. *See, e.g., Coston v. Product Movers*, C.A. No. 89–4865, slip op., 1990 WL 56516 (E.D.Pa. May 1, 1990) [1990 U.S.Dist. LEXIS 5203]. The Court of Appeals adopted a test for deciding the "idea/expression distinction" in connection with "utilitarian" works such as computer programs, but as the *Whelan Associates* opinion noted, that analysis is of limited utility in cases involving literary or "nonfunctional" works. *Id.* at 1238.

■ It is important to note that a copyright can be violated even when there is no substantial similarity between the works' literal elements. *Id.* A violation can take place by copying plot or plot devices, *see Twentieth Century–Fox Film Corporation v. MCA Inc.*, 715 F.2d 1327, 1329 (9th Cir.1983) or by establishing that the "total concept and feel" of the two works is similar. *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir.1977).

One of the most significant cases in the development of copyright infringement law is the analysis provided by Judge Learned Hand in *Sheldon v. Metro–Goldwyn Pictures Corporation*, 81 F.2d 49 (2d Cir. 1936). The plaintiffs in the *Sheldon* case had written a play called *Dishonored Lady*, and claimed that the MGM studio had infringed on their play by making a movie entitled *Letty Lynton*. The play and the movie were based on a notorious 19th century trial in Scotland in which a young girl was charged with poisoning a man she had previously agreed to marry.

Much of the plaintiff's play was "borrowed" from an historical account of the scandal, Judge Hand wrote, and "the plaintiff's originality [was] necessarily limited to the variants they introduced." Even so, plaintiff's entire work was not protected. The defendants were entitled to use "all that had gone before, but even the plaintiff's contribution itself, if they drew from it only the more general patterns, that is, if they kept clear of its expression." *Id.* at 54. The same generalities are applicable to this dispute.

The Alleged Similarities

■ The first thing that is readily apparent in this dispute is the sheer number of similarities in the fictional details of *Dusky Sally* and *Sally Hemings*. Many of these similarities cannot be traced to any historical account, including Fawn Brodie's biography of Jefferson.

In his introduction to *Dusky Sally*, Burgess wrote that "there is practically nothing at all in the historical record" about Sally Hemings. Chase–Riboud's assertion that other than the few facts which are known, practically everything about Sally Hemings which appears in both works was

"invented" by Chase–Riboud is not much of an overstatement.[16]

An "ordinary observer" need look no further than the dedication of both works to begin to understand the degree of this similarity. Chase–Riboud dedicated *Sally Hemings* to "the enigma of the historical Sally Hemings." Burgess, in his introduction to *Dusky Sally,* salutes Sally Hemings as "one of the truly great enigmas of our times."

Burgess has admitted reading *Sally Hemings* prior to writing *Dusky Sally.*[17] So the only question is that of substantial similarity.

Of the 21 instances of alleged similarity, some carry more weight than others, and there is no point in providing an in-depth analysis of each one. Approximately half of these instances are most likely not actionable because they are sufficiently general, or are based on the information provided by Madison Hemings.[18] But the following bear a closer scrutiny.

1. *The arrival scene in Paris.* Part II of *Sally Hemings* opens with a scene, set in Paris, in which Jefferson and Jimmy Hemings are anxiously awaiting the arrival of Polly Jefferson and Sally Hemings. A very similar scene is the opening scene of *Dusky Sally.* Burgess contends "all the essential facts are covered by Brodie," and alternatively that this is what amounts to a "scenes a faire," which has been defined as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given subject." *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978).

While Brodie described Abigail Adams' reaction to meeting Polly Jefferson and Sally Hemings, it should be noted that Abigail Adams met them in London, not in Paris. Although Brodie speculated as to what Jefferson's thoughts must have been when his youngest daughter and Sally Hemings arrived in Paris, it is an exaggeration to state that anything about this meeting is an "historical fact." As Chase–Riboud points out, the only things which are known is the approximate date of their arrival and that Jimmy Hemings was on Jefferson's household staff in Paris. Many of the secondary features of both scenes are the same. In both works, some of the relationship between Jefferson and James Hemings is revealed, and the relationship between Sally Hemings and Jefferson's daughters. Both scenes prominently mention the fact that the slaves are free on French soil, which becomes an important consideration later in both works.

2. *Making Lists.* In both works, Jefferson teaches Sally Hemings to make lists of her surroundings, or to try to recall the flowers around Monticello, as a way of controlling anxiety or despair. Burgess claims that this line from the Brodie book made this possible: "Sally could bridge the memory gap where Polly could not, bringing news of what had happened in the slave families, details of the trees and flowers at Monticello, all the small and private happenings that Jefferson hungered for."[19]

Putting aside the fact this was pure speculation on Brodie's part to begin with, even conceding this as a matter of historical record there is no place other than Chase–Riboud's novel where the naming of flowers is suggested as a way of dealing with despair. Although this device comes at a different point in each work, Burgess used the same location, the garden at Monticello, as the suggested setting for Jefferson's imagined advice.

3. *Massaging of Jefferson's Wrist.* In both *Sally Hemings* and *Dusky Sally,* the first physical contact between Jefferson and Sally Hemings comes when Jefferson asks Sally Hemings to massage his injured wrist. The only "historical" basis for this scene is that Jefferson did injure his wrist

---

16. Chase–Riboud's motion for summary judgment at 12.

17. *See* Plaintiff's Answer to Defendant's Counterclaim, at ¶ 13.

18. However, in making this distinction, I cannot find a single instance of alleged similarity which could safely be characterized as frivolous.

19. Brodie's *Thomas Jefferson* at 281–82.

in 1787 and had pain from it for some time. Burgess admits that he "adopted" this idea for his play.[20] In both works, this contact leads to a more intimate contact.

4. *The first sexual activity.* In both *Sally Hemings* and *Dusky Sally*, Jefferson initiates a sexual relationship, and in both, this takes place the night before he is leaving on a trip. In both, Sally Hemings is somewhat resigned to this activity taking place. In *Sally Hemings*, she says a prayer to herself to maintain her serenity. In *Dusky Sally*, at the moment of Jefferson's arrival, the stage directions state that Sally Hemings "closes her eyes, perhaps in prayer." Although the scene is given a slightly more lurid treatment in *Dusky Sally*, the two are startlingly similar. Burgess' explanation that "there is nothing more common to love stories than a love scene" is unconvincing.

5. *The letter from Dusseldorf.* Brodie describes a series of letters Jefferson wrote to a woman named Maria Cosway as "missives of such ineffable tenderness that they constitute the most remarkable collection of love letters in the history of the American presidency."[21] One of these letters was written from Dusseldorf in 1789.

In *Sally Hemings*, Chase–Riboud used the content of this letter practically verbatim, but made Sally Hemings the recipient. The same device, and in fact the same aftermath to it (i.e., Jefferson later orders Sally Hemings to destroy the letters he has sent her and she does so) appear practically unchanged in *Dusky Sally*.

6. *Sally Hemings' Nightmare.* Perhaps the single most glaring instance of "creative similarity" is the imagined slave auction. One of the climactic moments of Chase–Riboud's book is a scene in which Sally Hemings has a nightmare of Jefferson being sold at a slave auction. Needless to say, this is a completely imagined scene, yet it appears as a climax to *Dusky Sally*

as well. Burgess argues that "dream sequences are an ancient literary device used to dramatize states of spiritual or emotional transcendence," and more imaginatively, that this too amounts to scenes a faire. I am inclined to agree with Chase–Riboud's contention that the glaring similarity in these scenes, standing alone, would arguably establish a valid copyright infringement.

7. *The conflict over control of Monticello and its aftermath.* According to Madison Hemings, Jefferson promised Sally Hemings that there would be "no white mistress" at Monticello to outrank her, or in other words, that she would be in charge at Monticello when Jefferson was absent. This piece of reportage inspired a great deal of conflict in Chase–Riboud's book, where Sally Hemings and Patsy Jefferson, Jefferson's eldest daughter, clash over control of Monticello. The same dispute appears practically unaltered in *Dusky Sally*, with the same resolution. In both works there is a dispute over the "household keys" at Monticello. Sally Hemings refuses to surrender them to Patsy Jefferson, and the argument escalates until Patsy Jefferson humiliates Sally Hemings by ordering her to act as a wet nurse to Patsy Jefferson's child.

8. *James Hemings.* There is very little about Jimmy Hemings in Madison Hemings' reminiscences, perhaps because Madison Hemings was born after Jimmy Hemings' death. Nevertheless, Jimmy Hemings is a main character in both works, and his personality, adventures, and emotional highs and lows are depicted practically identically.

In both works, Jimmy Hemings tells Sally they are free on French soil. More significantly, in both works Jimmy Hemings is depicted as taking part in the attack on the Bastille; in both works Jimmy Hemings, after being freed, returns to Monticel-

---

**20.** Burgess submitted the Affidavit of Dr. William Howarth, a Professor of English literature at Princeton University, in support of his motion for summary judgment. Dr. Howarth's "professional opinion" on the injured wrist scene is typical of the affidavit's insight: "The scene is narrated in the novel and dramatized in

the play." Howarth Affidavit at 4. I am inclined to agree with Chase–Riboud's characterization of the affidavit as "remarkably unpersuasive."

**21.** Brodie's *Thomas Jefferson* at 13.

lo and tries to persuade Sally Hemings to escape; and in both works Jimmy Hemings thinks about killing Jefferson after he learns of his relationship with his sister.

Madison Hemings stated that his mother was aware of her freedom in France, but other than a few references to James Hemings in some of Jefferson's papers, and Brodie's conclusion that the evidence suggested that "Jimmy Hemings was quick of temper and anything but the stereotype of the docile slave," [22] there is practically no historical basis that Jimmy Hemings was "an angry young man" as Burgess contends. This view of his character was another invention of Chase–Riboud's which was copied, with very little modifications, by Burgess. Burgess asks,

> "What author worth his or her salt could resist working with the issue of how two relatively educated slaves—who knew they were free under French law—reacted to the storming of the Bastille? ... Any author is free to speculate that he participated in this colorful event, so long, of course, as he or she does not take substantially from someone else's treatment of the idea."

Burgess' motion for summary judgment at 51–52.

This is the essence of Burgess' case. Yes, I took the "idea," but my "treatment" was different. How different? The Jimmy Hemings scenes are a good example. In both Sally Hemings and Dusky Sally, Jimmy Hemings excitedly narrates the story of his adventures at the Bastille to a group at Jefferson's home in Paris. In Dusky Sally, Jimmy enters Jefferson's home, "bloodied and dishevelled, carrying a pike and wearing the red, white and blue cockade of the Revolution." In Sally Hemings, Jimmy Hemings wore a cockade as well, but used a butcher's knife during the attack. In both Sally Hemings and Dusky Sally, Jimmy reacts angrily when Sally Hemings does not want to leave Monticello. In Sally Hemings, Jimmy contemplates killing Jefferson in Paris; in Dusky Sally, he actually charges Jefferson with a

knife after Sally Hemings tells him she does not wish to leave Monticello.

The real issue in this case is whether the largely cosmetic alterations Burgess made from Chase–Riboud's novel are enough to successfully avoid a copyright infringement action.

Conclusion

In the Sheldon decision, Judge Hand wrote that he could not "avoid the conviction that if the picture was not an infringement of the play, there can be none short of taking the dialogue." Sheldon, supra, at 56. I have reached a similar conclusion here.

The resemblance of Burgess' Dusky Sally to Chase–Riboud's Sally Hemings is more than just a passing one. In fact the similarity between the two works is so obvious, and so unapologetic that an ordinary observer can only conclude that Burgess felt he was justified in copying Sally Hemings, or at least that there was no legal impediment to doing so, assuming a few modifications were made.

The rationale behind the idea/expression distinction is that the copyright laws were designed, as the Court of Appeals reiterated in Whelan Associates, to strike a balance between the protection and the dissemination of information which will promote learning, culture and development. Whelan Associates, supra, at 1235. The copyright laws were not enacted to inhibit creativity. But it is one thing to inhibit creativity and another to use the "idea" versus "expression" distinction as something akin to an absolute defense—to maintain that the protection of copyright law is negated by any small amount of tinkering with another writer's "idea" that results in a slightly different "expression."

It might be useful to borrow the terminology of another form of creative expression. In Thomas Jefferson: An Intimate History, Fawn Brodie provided what amounted to an outline of a romance between Jefferson and Sally Hemings, an outline drawn through the use of historical research, supposition, and implication.

---

**22.** Brodie's Thomas Jefferson at 300.

Chase–Riboud took Brodie's outline and made it a portrait, painting an almost wholly-imagined life for Sally Hemings, filled with imagined scenes, thoughts and relationships. An alarming number of these same creative inventions appear in *Dusky Sally*.[23]

There can be no doubt that Burgess used Chase–Riboud's work in writing his play. I have concluded that the two works are substantially similar in expression. I will therefore grant defendant's motion for summary judgment and enter judgment in favor of the defendant, Barbara Chase–Riboud.

Therefore, I shall issue the following order:

### ORDER

And now, this 28th day of May, 1991, it is ORDERED that:

1. Plaintiff's Motion for Summary Judgment is DENIED:

2. Defendant's Motion for Summary Judgment on her counterclaim for copyright infringement is GRANTED, and a permanent injunction is entered against the plaintiff, enjoining him from any further distribution of the printed play, or production of the play, or sale of any derivative rights, unless and until he signs an appropriate license agreement with defendant for the use of substantial elements of her novel, and agrees to pay an appropriate license fee;

3. The remaining counts in plaintiff's complaint are DISMISSED as moot;

4. Both sides to bear their own costs;

5. The Clerk of Court is directed to list this case as Closed.

---

**23.** This is not an instance where the similarities were of a general nature, as in the three cases relied on by Burgess: *Hoehling v. Universal City Studios, Inc.* 618 F.2d 972 (9th Cir.1980) (defendant's screenplay did not infringe on plaintiff's book about the *Hindenburg* disaster); *Alexander v. Haley,* supra, (defendant's slavery novel *Roots* did not infringe on plaintiff's slavery novel *Jubilee*); and *Walker v. Time Life Films,* 784 F.2d 44 (2d Cir.1986) (defendant's police movie *Fort Apache: The Bronx* did not infringe on plaintiff's non-fiction police book entitled *Fort Apache*).